IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS,

T.L.B.,1

               Plaintiff,

     Vs.                            No. 20-1370-SAC

KILOLO KRJAKAZI,
Acting Commissioner of Social Security2,

           Defendant.

MEMORANDUM AND ORDER

      This is an action reviewing the final decision of the defendant Commissioner of Social Security ("Commissioner") that denied the claimant T.L.B.'s Title II application for disability insurance benefits and Title SVI application for supplemental security income. The matter has been fully briefed by the parties and, therefore, is ripe for ruling.

**STANDARD OF REVIEW**

      The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that the Commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." The Supreme Court recently

---

1 The use of initials is to preserve privacy interests.
2 On July 9, 2021, Kilolo Krjakazi was named acting Commissioner of Social Security replacing Andrew M. Saul.

1

summarized the relevant holdings behind this standard:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." *Ibid*.; *see, e.g., Perales*, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison*, 305 U.S. at 229, 59 S.Ct. 206. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

*Biestak v. Berryhill*, ---U.S.---, 139 S.Ct. 1148, 1154 (2019). In using this standard, a court examines the whole record, including whatever in the record fairly detracts from the weight of the Commissioner's decision, and decides whether substantial evidence supports the decision. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994). A court, however, may not reverse the Commissioner's choice between two reasonable but conflicting views, even if the court would have chosen differently assuming a *de novo* review. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). The court reviews "only the sufficiency of the evidence, not its weight." *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007).

**PROCEDURAL BACKGROUND**

TLB's applications in 2010 alleged he was disabled beginning in

in 2008 based on attention deficit hyperactivity disorder ("ADHD"),
depression, and dyslexia. The administrative denial of his claims was
judicially reviewed in federal district court which resulted in a remand of his
claim in 2015. On remand, a different ALJ issued an unfavorable decision in
August 2016, but the Appeals Council remanded the claims in October of
2017. The claims were heard by a different ALJ who issued an unfavorable
decision in August of 2018. The Appeals Council remanded the claims in July
of 2019, and the same ALJ issued another unfavorable decision on December
19, 2019. The Appeals Council rejected the claimant's exceptions, and the
ALJ's December 19th decision now stands as the Commissioner's final
decision for purposes of judicial review.

**ALJ's DECISION**

The ALJ employed the following five-step sequential evaluation
process (20 C.F.R. §§ 404.1520 and 416.920) for determining a disability
application. ECF# 14, p. 18. First, it is determined whether the claimant is
engaging in substantial gainful activity. Second, the ALJ decides whether the
claimant has a medically determinable impairment that is "severe" or a
combination of impairments which are "severe." At step three, the ALJ
decides whether the claimant's impairments or combination of impairments
meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part

404, Subpart P, Appendix 1. The ALJ at step four determines the claimant's residual functional capacity ("RFC") and then decides whether the claimant has the RFC to perform the requirements of his or her past relevant work. The last step has the ALJ determine whether the claimant is able to do any other work considering his or her RFC, age, education and work experience. For steps one through four, the burden rests with the claimant to prove a disability that prevents performance of past relevant work, but the burden shifts to the Commissioner at step five. *Blea v. Barnhart*, 466 F.3d 903, 907 (10th Cir. 2006).

In his decision, the ALJ found for step one that the "claimant has not engaged in substantial gainful activity since November 30, 2008, the alleged onset date." ECF# 15-9, p. 13. For step two, the ALJ found the claimant's severe impairments were "attention deficit hyperactivity disorder, depression, learning disorder/dyslexia." *Id*. At step three, the ALJ found that the "claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." *Id.* at 14. The ALJ determined at step four that the claimant had the RFC:

> to perform a full range of work at all exertional levels but with the following non-exertional limitations:   limited to simple, routine repetitive tasks that are limited to low stressors such as, slow-paced work, do not require multi-tasking; any have changes in tasks

4

> performed or locations of work; would work better in jobs that require non-verbal skills; and is limited to occasional interaction with co-workers, supervisors, and with the general public.

*Id*. at 16. Based on this RFC finding, the ALJ determined that the claimant does not have any relevant work but that considering his younger age, his high school education, past work experience and RFC, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id*. at 24. Thus, the ALJ found that the plaintiff was not disabled as of November 30, 2008, through the date of the decision, December 19, 2019. *Id*. at 25.

**SUMMARY OF RELEVANT EVIDENCE**

T.L.B. attributes his mental limitations to a concussion and injuries sustained when he was in the eighth grade. A car struck him while he was riding his bike. He went on to complete high school with tutoring and special assistance. A social worker referred him to Dr. Stanley Mintz for a psychological evaluation in April of 2008 based on symptoms of an attention deficit disorder ("ADD") and dyslexia. Dr. Mintz noted the claimant was "a pleasant young man, he is alert and oriented in all spheres." ECF# 15-8, p. 6. While not appearing depressed or anxious, the claimant did exhibit symptoms of ADD and Dyslexia. "He has done part time jobs, janitorial work for a school district, he was doing some stocking work at a department

5

store, [and] he was doing youth development work." *Id.* Testing showed a WAIS-III Full Scale I.Q. of 90 and a verbal I.Q. of 91 putting him in the average range. Besides a learning disability in reading and math, dyslexia and ADD, Dr. Mintz did not find any other exhibited pattern of mental illness symptoms. Dr. Mintz encouraged the claimant to pursue his goal of attending barber school saying he displayed the capability "of being trained at other vocational technical levels." *Id*. at 8.

Discouraged about his lack of success and unfulfilled dreams and worried over his ability to pass the written barber school tests, T.L.B. was seen by Dr. Melvin Berg for a psychological evaluation in March of 2010. Dr. Berg noted that T.L.B. graduated from high school with a 2.27 GPA and with excellent athletic achievement but was unable to participate in college sports because of his poor grades. His verbal I.Q. was 86, and his full scale was 80 with variable performance in missing easier items while succeeding at more difficult ones. "As a result, his scores mask his ability to succeed at more difficult items than individuals in this range of intelligence can typically do." ECF# 15-8, p. 22. Dr. Berg noted that T.L.B.'s low abilities in verbal skills and absorbing verbal information was compounded by his attention problems. *Id.* at 23. Dr. Berg suggested an evaluation for ADD medication and depressed mood medication and supportive counseling or

6

psychotherapy. *Id.* T.L.B. followed this with a visit to the general family physician asking about medications for ADD and mild depression as he prepared for the written barber school examination. *Id.* at 31. He was started on Concerta for seven days. *Id.* at 32. He apparently stopped taking the medication in late April because of side effects, and he did not believe it was helping. He was prescribed another ADD medication with a follow up in four weeks.

T.L.B. next was seen by William Moore, LSCSW, in November of 2010 for an intake assessment and evaluation for therapy. He presented as cooperative, engaged, and able-mannered but pained and sad because of poor vocational and educational success. The prognosis was guarded due to "perpetual pattern of procrastination and avoidance" and needing the support of parents. *Id.* at 41.

In 2011, T.L.B. went to the Dyslexia and Learning Differences Center in Lawrence. After assessments, there were recommended accommodations for him to take the written barber school examination. *Id*. at 72. He was diagnosed with ADHD, a reading disorder and learning disability dating back to elementary school years, testing anxiety, severe memory and auditory processing issues, and Irlen Syndrome to a moderate to severe degree.

7

In March of 2011, T.L.B. was psychologically evaluated by Dr. Robert Barnett in connection with his disability application. Behaviorally, he was found to be cooperative, friendly, but quiet. ECF# 15-8, p. 54. He reported looking for work as his last full-time employment was as a stocker in 2008 during which he got along with fellow employees and received positive work reviews from supervisors. *Id.* He was not currently looking for an outpatient therapist and had stopped taking ADD medication a month earlier. *Id.* at 55. He gave the impression of functioning in the borderline range consistent with his verbal IQ of 79 and a full-scale IQ of 79. *Id.* Dr. Barnett's clinical assessment was that T.L.B. did not display "difficulty with attention or concentration during the interview," and that he appeared "cognitively capable of simple repetitive work tasks and some complex tasks." *Id.* at 56. Dr. Barnett did not find evidence of ADHD disorder during the interview, as he was not "distractable . . . or hyperactive." *Id*.

Between 2012 and 2015, T.L.B. occasionally saw therapists at Valeo Behavioral Center. At the intake, he reported that he was working a night shift stocking shelves and presented himself as having among other things--major depressive disorder, diagnosis of ADHD, hopeless, irritable, difficulties with sleeping, poor concentration, impaired memory, and inability to maintain job performance. ECF# 15-14, p. 10. The interpretative

8

summary noted that T.L.B. presented "well" and did not appear to "have the difficult issues he presents." *Id.* His sessions focused on improving his self-talk and reducing anger and turmoil. The records show that T.L.B. kept up appointments for the first month or so, and then he missed or canceled many of his appointments after that.

In April of 2015, T.L.B. went to Dr. Tietze complaining of panic attacks, anxiety, and depression. Noting definite elements of major depression, he was referred again to Valeo for therapy and was prescribed citalopram. ECF# 15-14, p. 78. In July of 2015, he returned to Dr. Tietze who noted that claimant was working in a barber shop and had not continued therapy at Valeo after the initial visits. His medication was changed to venlafaxine, and therapy was again discussed. *Id*. at 75. The claimant told Dr. Tietze that his mood "may be a bit improved." *Id.* at 74.

In March of 2016, T.L.B. was again evaluated at the Dyslexia and Learning Differences Center in Lawrence with a consultation by the Center's director, Linn Suderman, LCPC, MS, Ph.D. Evaluation tests and observations were repeated, and the reported results were that his general cognitive ability was in the borderline range, with verbal comprehension abilities in the average range, and ability to sustain attention and concentration in the extremely low range. ECF# 15-14, p. 142. Director

9

Suderman completed a medical statement for the claimant's disability claim. She described marked and extreme limitations with daily living activities and with maintaining social function that resulted in an "extreme need for reminders" and in being easily distracted and bored. *Id.* at 161-62. She also commented, "He will give his full attention to interesting or demanding tasks for a while, then his concentration breaks down and he becomes angry, irritable, overwhelmed, withdraws or asks questions to defuse or minimize the situation." *Id*. at 163.

In September of 2016, T.L.B. began seeing Dr. Spethman, a general practice physician with complaints of anxiety and irritability that were not helped by the prescribed hydroxyzine. Dr. Spethman recorded that the claimant was not depressed but presented as nervous and anxious. His mood and affect were described as normal. He was prescribed Zoloft for PTSD and anxiety with a follow-up in one month. ECF# 15-14, pp. 260-62.

In late 2017, Dr. Michael Lace, a psychologist, served as an expert in the disability proceeding. He reviewed the record and completed a medical source statement on the claimant's mental ability for work-related activities. He found marked limitations in understanding and carrying out complex instructions and in making judgments on complex work-related decisions. ECF# 15-14, p. 189. He found moderate limitations in the ability

10

to do the same when simple instructions were involved. *Id*. He also opined that claimant was "limited to simple, routine, repetitive tasks that are slow-paced with low production quotas." *Id*. at 197. He was also "limited to low stress work with few, if any, changes in the nature of tasks performed and the location of work." *Id*.

T.L.B. again returned to Valeo for therapy beginning in February of 2018. During this stint of therapy, the APRN Kurtis Corrico completed a mental medical source statement on the claimant. ECF# 15-14, p. 202. He noted a diagnosis of major depressive disorder and post-traumatic stress disorder with no side effects from medications. *Id*. He checked mild limitations on ability to maintain an ordinary routine and to make simple work-related decisions. *Id.* at 203. He did note a moderate limitation on the ability to complete a workday and workweek or to keep up a consistent pace without some disruption by his mental symptoms and the taking of unreasonable rest periods. *Id*.

In May of 2018, Robert Suderman, Psy.D. completed a medical source statement for the pending disability proceeding based on T.L.B.'s assessments and treatment at the Dyslexia and Learning Differences Center in Lawrence. ECF# 15-14, p. 303. He noted that T.L.B.'s mental condition occasionally caused extreme restrictions in daily living and caused extreme

11

difficulty in social functioning due to angry outbursts when feeling misunderstood. *Id.* He also noted extreme limitation from psychological symptoms in completing workday and workweek without interruptions or in performing at a consistent pace without unreasonable rest periods. *Id.* at 304. He also noted extreme limitations in the ability to ask simple questions and ability to accept instructions or to respond appropriately to supervisors' criticism. *Id*. at 305.   He noted marked limitations in carrying out very short and simple instructions. *Id*. at 308. He also found extreme limitations in the claimant's abilities to maintain attention, concentration, regular attendance, and ordinary routine. *Id*.

Robert and Linn Suderman submitted for the ALJ's consideration a memorandum dated May 7, 2018, which disclosed their impressions of the T.L.B.'s work situation. ECF# 15-14, pp. 311-313. They explained their efforts and help in securing the T.L.B.'s current barbershop position and how the shop owner has cooperated in establishing a "sheltered work environment" to find out if T.L.B. could make it in a workplace environment and hopefully make a "few bucks." *Id.* at p. 312. With the owner's permission, the Sudermans reported that T.L.B. "has been uniformly late nearly every day," leaves work early and unexpectantly, and is regularly absent from work even missing an entire week. *Id.* The shop owner said he

12

would not hire T.L.B. as a salaried barber because of the "absences, tardiness, lack of concentration, and recently dissatisfied customers." *Id*. at 313. They opined that their opinion of T.L.B. possibly succeeding "in a regular barber setting" had changed, and they no longer believed this was possible. *Id*.

Between March of 2018 and August of 2019, T.L.B. visited Valeo receiving counseling for anger, stress, and anxiety. ECF# 15-14, pp. 361-414. Medication was prescribed and taken throughout the counseling with some reduction in his symptoms. The medication was changed at one point due to side effects.

In September of 2019, the Commissioner's Cooperative Disability Investigation ("CDI") unit on a referral from the Topeka office investigated the claimant's alleged disability. The CDI investigator reviewed some of the claimant's medical records and statements. The investigator visited with the Inspector for the Kansas State Board of Barbering and discussed the claimant's completed studies and passed examinations to receive his barber's license.   He apparently scored 90 on the national written exam, 96 on the state exam, and 82.75 on his practical exercise. ECF# 15-14, p. 327. He received his license in 2013 and renewed it all but two years, 2015 and 2017. *Id*. In August of 2019, the investigator spoke

13

with the local barber shop owner/operator. The owner admitted that he allows the claimant to cut hair at his barbershop as a favor to the claimant's brother, the owner's best friend. The owner also said he does not charge the claimant the normal business rate but just receives a portion of whatever the claimant earns. *Id*. at 329-30. The owner commented that the claimant was "very good with the artistic/free style" part of cutting but struggled with "some of the more basic skills." *Id*. at 330. The owner said he was "not aware of any mental issues" but added the claimant was "lazy." *Id*. The investigator reported that the claimant was in the barber shop at the time of this interview. The investigator's report concluded that the claimant did not appear to need assistance with mental activities based upon his graduation from barbering college, his passing of the barber examinations, and the shop owner's failure to report issues with mental activities. *Id.* at 331.

In October of 2019, T.L.B. was seen for a consultative DDS Mental Status Examination by Thomas S. Bartlett, a psychologist. The report noted that he appeared irritable and did "not appear to take the testing seriously and his effort is marginal." ECF# 15-14, p. 355. While opining that the claimant's intellectual functioning "is clearly below average," Dr. Bartlett disclosed not being "sure how accurate of a picture the current results are." *Id*. at p. 357. The test results show, "general cognitive ability . . . within the

borderline range of intellectual functioning." *Id.* Because of some variability

between subtests, Dr. Bartlett urged caution in interpreting the scores and

opined that the claimant "can complete simple instructions." *Id.* at 358. Dr.

Barlett followed this opinion with:

> He would not be a good candidate for interacting with the public due to
> his irritability. Coworkers and supervisors might struggle with his
> irritable and negative attitude. I would recommend he have a payee.
> His depression is likely to interfere with his ability to perform in a
> consistent and ongoing manner in a full-time occupational setting.

*Id*. at 358-59. In the medical statement of mental limitations to do work-

related activities, Dr. Bartlett checked a marked limitation to respond

appropriately to usual work conditions and to changes in a routine work

setting with moderate limitations on interacting with others in the workplace.

*Id*. at 352. He further noted other impairments, "concentration, retention,

and focus are poor." *Id.*

**ARGUMENT AND ANALYSIS**

The claimant points out that this case has been remanded three

times for the ALJs to weigh properly the medical opinions on mental

disability. The ALJ's written decision now on appeal addressed each medical

opinion, including the most recent opinion given by the psychological

consultative examiner, Dr. Bartlett. The claimant's argued issue on appeal is

that the ALJ afforded "some weight" to Dr. Bartlett's opinion, rejected a

marked limitation on the claimant's inability to respond to usual work situations or changes, and then failed to incorporate Dr. Bartlett's other noted limitations into the RFC determination without explaining their omission from the RFC. In short, the plaintiff contends the ALJ's decision fails to resolve the inconsistencies between the limitations expressed by Dr. Bartlett and the mental RFC determination.

Because this issue turns on the ALJ's handling of Dr. Bartlett's opinion, the court will set out from the ALJ's narrative discussion those relevant paragraphs:

> Lastly, in October 2019, the claimant underwent a psychological consultative examination with Dr. Bartlett . . . . Consistent with the claimant's report of a depressed mood, Dr. Bartlett reported the claimant came across as depressed and irritable, impatient, and annoyed. Dr. Bartlett reported the claimant exhibited marginal eye contact and social skills, but that they were not inappropriate. He reported the claimant exhibited difficulty with two tasks that demanded mental control. In addition, on the WAIS-IV, his general cognitive ability, as estimated by the WAIS-IV, was in the borderline range (FSIQ=72). His general verbal comprehension abilities were in the borderline range (VCI=76), and his general perceptual reasoning abilities continued to be in the low average range (PRI=73). Based on his examination and review, Dr. Bartlett diagnosed the claimant with ADHD predominantly inattentive presentation and persistent depressive disorder with anxious distress . . . . Notably, Dr. Bartlett reported the claimant displayed a wide variety of behaviors, but reported he had only been treated with "Zoloft and one other pill" "for about two years" . . . . He also reported activities of daily living including the ability to drive, to perform basic computer skills, to use a cell phone and social media, to manage his own finances, and to perform all personal care tasks independently. In addition, he reported helping to care for his two year old daughter. He also reported hobbies

and interests including playing basketball, watching his daughter, and writing music. Moreover, he reported working in a barber shop averaging about forty-hours per month.

While these clinical findings support some mental limitations, the level of treatment he underwent is not suggestive of him having disabling limitations. Prior to March 2010, the claimant admitted that he had not received any treatment for depression or ADHD . . . . Notably, the record does not show any evidence of ADHD medication prescribed to the claimant during the relevant period. Moreover, the record shows that he has not required any inpatient care because of mental health crisis. Nor has he exhibited any significant symptoms regularly such as panic attacks, suicidal ideations with plan, or psychosis. One would expect objective abnormalities in a least some of these areas if the claimant were truly experiencing anxiety or panic.

    . . . .

As noted above, the claimant was most recently evaluated by a psychological consultative examiner in October 2019 . . . . Based on his evaluation and review of the record, Dr. Bartlett opined the claimant had moderate limitations in understanding, remembering, carrying out, and making simple judgment on simple instructions. He further opined the claimant had marked limitation in these areas for complex instructions and work-related decisions. He also opined the claimant had mostly moderate limitations in his ability to interact with others, but that he had marked limitations in his ability to respond appropriately to usual work situations and to changes in routine. Dr. Bartlett's opinion is afforded some weight. The undersigned notes that Dr. Bartlett opinion that the claimant can complete simple instructions is generally consistent with the objective evidence of record, including Dr. Bartlett's own evaluation and test results, which indicate the claimant is generally functioning in the borderline range. His opinion, and the test results, are also consistent with the claimant's ability to perform a range of daily activities independently. However, his marked limitation in responding to usual work situations and to changes in work settings is not completely supported by the record. For example, he based some of his limitations due to a "negative attitude", not clinical findings and also indicated that the testing may not have been fully reliable. While there are reports by the claimant's employer

17

through Dr. Suderman's observations that the claimant is routinely late for work and has had some clients not return due to poor haircuts, the fact remains that the claimant continues to work as a barber for approximately five hours per day, five days per week (See Exhibit 44F and hearing testimony). Moreover, the CDI Investigative report shows that the claimant has been able to maintain his license, and perform skilled artistic designs (See 45F/15-22).

. . . .

In summary, the claimant's allegations of total disability are out of proportion with the medical and other evidence of record. Nevertheless, the undersigned finds the claimant's impairments require a reduction of the residual functional capacity. The undersigned has determined the claimant's residual functional capacity based on the entire record, including the objective medical findings in the record, the clinical signs and findings on examination and the claimant's partially consistent testimony. Weighing all relevant factors, the undersigned finds that claimant's subjective complaints did not warrant any additional limitations beyond those established in the residual functional capacity previously outlined in this decision.

ECF# 15-9, pp. 19-20, 23-24.

In assessing a claimant's RFC, the ALJ is to consider all medical opinions of record and make an RFC determination based on the record as a whole. *Paulsen v. Colvin*, 665 Fed. Appx. 660, 663-64 (10th Cir. Nov. 1, 2016). Under SSR-96-8p, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activity." SSR 96-8P, 1996 WL 374184, at *3 (July 2, 1996). Requirements for the RFC determination include:

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical

> facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8P, 1996 WL 374184, at *7 (footnote omitted). In reviewing the ALJ's evaluation of the medical evidence, it is enough if the court can follow the ALJ's reasoning and "can determine that correct legal standards have been applied." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The court must rely on its "common sense" and not "insist on technical perfection" in the ALJ's decision even though a more detailed explanation would make judicial review "easier." *Id*.

The plaintiff concedes the ALJ's decision "summarized much of Dr. Bartlett's medical opinion." ECF# 17, p. 12. He understands the ALJ to have accepted the opinion in finding the plaintiff could "complete simple instructions" and to have rejected the opinion in not finding a marked limitation in the plaintiff's ability for responding to routine work situations or to changes in work environment. The plaintiff, however, faults the ALJ in simply giving "some weight" to Dr. Bartlett's opinion without addressing how the RFC accounts for Dr. Bartlett's other opinions, specifically:   1) a

19

moderate limitation on the plaintiff's ability to understand and remember simple instructions and to make judgments on simple work-related decisions; ECF# 15-14, p. 351; and 2) the claimant's "depression is likely to interfere with his ability to perform in a consistent and ongoing manner in a full-time occupational setting," *id*. at 356. Finally, the plaintiff contends the ALJ's failure to incorporate Dr. Bartlett's other limitations caused harm as the vocational expert testified to the unavailability of work if the claimant had difficulty with keeping up punctuality, attending work and missing less than two days a month, or in consistently understanding, remembering, and carrying out decisions based on simple instructions.

The court does not find the plaintiff's arguments persuasive. Instead, the court finds it can track from the ALJ's decision how he reasonably afforded "some weight" to Dr. Bartlett's opinion and how he accounted for Dr. Bartlett's other limitations at issue here consistent with the governing law. The ALJ gave weight to Dr. Bartlett's opinion that the plaintiff can complete simple instructions as being "generally consistent with objective evidence of record" and with Dr. Bartlett's evaluation results which showed the plaintiff to function generally in the borderline range. ECF# 15-9, p. 23. Earlier in the ALJ's decision, he summarized Dr. Bartlett's clinical findings and then observed that the "level of treatment" received was not

20

"suggestive" of disabling limitations by noting the lack of ongoing care, limited prescribed medications, no incidents of inpatient care, and limited significant symptoms. *Id.* at 20. The ALJ also found the evidence of the plaintiff's range of daily activities to be consistent with Dr. Bartlett's opinion that the claimant could complete simple instructions. *Id.* at 23. Earlier in his decision, the ALJ summarized what Dr. Bartlett had recorded as plaintiff's range of daily activities to include driving, basic computer skills, using cell phone and social media, managing his own finances, maintaining personal care tasks, helping to care for his two-year-old daughter, working parttime in the barber shop, and keeping up his hobbies of playing basketball and writing music. *Id.* at 20.

The court disagrees with the plaintiff that this case is like *Sowers v. Astrue*, 2013 WL 172866 (D. Kan. Jan. 16, 2013). The only medical evidence of RFC there came from one medical opinion which the ALJ gave "some" weight but, "in fact rejected all of his opinions." *Id*. at *4. That did not happen here. The plaintiff does not take issue with ALJ's discussion and weighing of the numerous medical opinions here. Nor does the court agree that this case is one where the ALJ's narrative discussion of the RFC assessment fails to consider and resolve inconsistencies or conflicts in the medical record. *See Booker v. Berryhill*, 2018 WL 531188, at *4 (D. Kan.

21

Oct. 26, 2018). The ALJ repeatedly evaluates the medical evidence and clinical findings against the level of medical care and treatment prescribed and received, the plaintiff's living activities, and the lack of objective abnormalities. *See, e.g.*, ECF# 15-9, pp. 17-18, 20-24. Moreover, the ALJ expressly found that his RFC determination had "accommodated the claimant's moderate difficulties in understanding, remembering, or applying information, interacting with others, maintaining concentration, persistence, or maintaining pace, and adapting or managing himself by limiting him accordingly." *Id*. at 20-21.

The ALJ provided a sufficient explanation for not giving weight to all of Dr. Bartlett's opined limitations. He said the record did not support the marked limitation for responding to typical work situations or to work-setting changes. The ALJ also noted that "some" limitations found in Dr. Bartlett's opinion were not based on "clinical findings" but on a "negative attitude." *Id*. at 23. The ALJ also noted that Dr. Bartlett had acknowledged his testing of the plaintiff may not be "fully reliable." *Id.* Dr. Bartlett in his report noted that the plaintiff appeared not only "irritable" but also as not taking "the testing seriously" with "marginal" effort. ECF# 15-14, p. 357. Thus, Dr. Bartlett wrote he was unsure "how accurate of a picture the current results are." *Id*. As far as the expressed limitations on the plaintiff's ability to

22

perform work in a timely and consistent manner, the ALJ observed:

> While there are reports by the claimant's employer through Dr.
> Suderman's observations that the claimant is routinely late for work
> and has had some clients not return due to poor haircuts, the fact
> remains that the claimant continues to work as a barber for
> approximately five hours per day, five days per week (See Exhibit 445
> and hearing testimony). Moreover, the CDI Investigative report shows
> that the claimant has been able to maintain his license, and perform
> skilled artistic designs . . . .

ECF# 15-9, pp. 23-24. Thus, the ALJ's decision can be read as affording only
some weight to Dr. Bartlett's opinion in that the plaintiff's other non-
exertional limitations such as, the ability to perform in a consistent and
ongoing manner, was contradicted by objective evidence of the plaintiff's
current level of vocational activities.

The court agrees with the Commissioner that the ALJ's RFC
determination can be read as incorporating moderate limitations on the
ability to understand and remember simple instructions and making work-
related decisions. The ALJ found the plaintiff was "limited to simple, routine,
repetitive tasks that have limited stressors, such as slow-paced work, do not
require multi-tasking, few changes in task performed and locations of work."
ECF# 15-15, p. 73; #15-9, p. 16. The vocational expert understood the RFC
as applying to a range of unskilled jobs. ECF# 15-15, p. 73. It is not
necessary that the ALJ repeat the moderate limitations in the RFC, because
it is enough to incorporate "these limitations by stating how the claimant

was limited in the ability to perform work-related activities." *Smith v. Colvin*,

821 F.3d 1264, 1269 (10th Cir. 2016). The Tenth Circuit in *Smith* held:

> This approach is acceptable in our circuit, for we have held in a published opinion that an administrative law judge can account for moderate limitations by limiting the claimant to particular kinds of work activity. *See Vigil v. Colvin*, 805 F.3d 1199, 1204 (10th Cir.2015) ("[T]he [administrative law judge] accounted for [the claimant's] moderate concentration, persistence, and pace problems in his [assessment of residual functional capacity] by limiting [the claimant] to unskilled work."). In *Lee v. Colvin*, [631 Fed. Appx. 538 (10th Cir.2015) (unpublished)], we applied this approach, concluding that the administrative law judge did not err by incorporating the moderate limitations in restricting the claimant in jobs involving complex tasks, close supervision, or meaningful interaction with supervisors or peers. Based on the reasoning in *Lee v. Colvin*, we reject Ms. Smith's argument that the administrative law judge should have assessed additional nonexertional impairments.

821 F.3d at 1269. The court is satisfied that the RFC determination here

adequately incorporates moderate limitations by spelling out that the simple

work was limited to routine and repetitive work that involved limited

stressors, that was slow-paced, that had no multi-tasking, and that had few

if any changes in tasks performed or in locations for work.

As the court discussed above, the ALJ's decision can be read to

explain not relying on those medical opinions limiting the plaintiff's ability to

perform in a consistent and ongoing manner. First, the ALJ noted that the

Dr. Bartlett had attributed "some limitations" to a negative attitude and not

to clinical findings. Second, Dr. Bartlett's report conceded he had questions

about the reliability of his testing results because of the plaintiff's marginal efforts. This point necessarily reflects upon Dr. Bartlett's choice to opine vaguely that the plaintiff's "depression is likely to interfere." ECF# 15-14, p. 359. Third, the ALJ acknowledged other evidence from the plaintiff's employer through Dr. Suderman pointing to the plaintiff being routinely late and giving poor haircuts. The relevance of this evidence is that it coincides with Dr. Bartlett's opinion that "depression is likely to interfere with . . . ability to perform in a consistent and ongoing manner in a full-time occupational setting." ECF# 15-14, p. 359. The ALJ found that despite this evidence, and apparently the opinions consistent with it, "the fact remains that the claimant continues to work as a barber for approximately five hours per day, five days per week" and "has been able to maintain his license, and perform skilled artistic designs." ECF# 15-9, pp. 23-24. The ALJ earlier observed in the same vein, "[w]hile the claimant's employer reported attendance and punctuality issues, the record shows that the claimant has remained employed for a significant amount of time despite these issues." *Id*. at 21. The ALJ may appropriately rely on the plaintiff's ability to work part-time at skilled labor as evidence that his non-exertional limitations do not result in disabling symptoms for unskilled work. *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful

activity, it may show that you are able to do more work than you actually did."); *Franklin v. Chater*, 1996 WL 731591, at *3 (10th Cir. Dec. 20, 1996) ("20 C.F.R. § 404.1571 (any work performed during a period of claimed disability may demonstrate an ability to perform substantial gainful activity)"). Finally, the court recognizes some merit to the Commissioner's argument that Dr. Bartlett's final opinion about the claimant's depression being "likely to interfere" fails to express a limitation within the workplace context. Because of this deficiency, the ALJ would not be required to consider that opinion in formulating the RFC. *See Paulsen v. Colvin*, 665 Fed. Appx. 660, 666 (10th Cir. Nov. 1, 2016).

The court's scope of review is limited to the issues properly raised and briefed. *See Allman v. Colvin*, 1329 (10th Cir. 2016). The failure to present arguments to this court waives review. *Id.* The court need only "consider and discuss . . . those . . . contentions that have been adequately briefed for . . . review." *Keyes-Zachary v. Astrue*, 695 F.3d at 1161 (citation omitted). The plaintiff's sole challenge on appeal is with the ALJ's consideration of the consultative medical opinion of Dr. Bartlett. Finding no reversible error in that regard, the court affirms.

IT IS THEREFORE ORDERED that the Commissioner's final decision that the claimant was not disabled from November 8, 2008, through

December 19, 2019, is affirmed.

Dated this 17th day of November, 2021, Topeka, Kansas.


_/s Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge